O
JS-6

```
cc: order, docket, remand letter to Riverside County
    Superior Court, No. RIC 117545
```

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PRIME PARTNERS IPA OF TEMECULA, INC., a California corporation, and MEADOWVIEW IPA MEDICAL GROUP, INC., a California corporation,<br><br>              Plaintiffs,<br>    v.<br><br>KALI P. CHAUDHURI, an individual; HEMET COMMUNITY MEDICAL GROUP, INC., a California corporation; KM STRATEGIC MANAGEMENT, LLC, a California limited liability company; MICHAEL FOUTZ, an individual; WILLIAM E. THOMAS, an individual; and DOES 1 through 100, inclusive,<br><br>              Defendants. | Case No. 5:11-cv-01860-ODW(FMOx)<br><br>**ORDER GRANTING MOTIONS TO DISMISS [38, 43] AND DENYING MOTION TO STRIKE AS MOOT [40]** |

## I.    INTRODUCTION

Before the Court are Defendants' three concurrently filed motions: (1) Defendants Kali P. Chaudhuri; Hemet County Medical Group, Inc. ("HCMG"); and KM Strategic Management, LLC's ("KM Management") (collectively the "Chaudhuri Defendants") Motion to Dismiss Plaintiffs' First Amended Complaint ("FAC") (ECF No. 38); (2) Defendants Michael Foutz and William E. Thomas's (collectively the "Foutz Defendants") Motion to Dismiss and Special Motion to Strike

(ECF No. 43); and (3) the Chaudhuri Defendants' Motion to Strike Portions of Plaintiffs' FAC (ECF No. 40).  Having carefully considered the papers filed in support of and in opposition to the instant Motion, the Court deems the matter appropriate for decision without oral argument.  *See* Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15.  For the reasons discussed below, Defendants' Motions to Dismiss are **GRANTED**, and the Chaudhuri Defendants' Motion to Strike is **DENIED AS MOOT**.

## II.    FACTUAL BACKGROUND

Plaintiffs Prime Partners IPA of Temecula, Inc. and Meadowview IPA Medical Group, Inc. are independent practice associations[1] ("IPAs") located in Murrieta, California, and Corona, California, respectively.  KM Management, which is owned exclusively by Defendants Chaudhuri and Foutz, is and has been the management company for Prime Partners and Meadowview for an unstated period of time.  (FAC ¶¶ 31, 43.)

In July 2004, HCMG entered into a Group Provider Services Agreement ("PSA") with Prime Partners (the "2004 PSA").  (FAC ¶ 41.)  The PSA required HCMG to act as Prime Partners's IPA and to pay Prime Partners 100% of all revenue HCMG received from HMOs for patients associated with Prime Partners physicians.  (*Id.*)  The PSA also required Prime Partners to subcontract all of its management services to KM Management.  (FAC ¶ 43.)

Although the 2004 PSA expired by its own terms on June 30, 2009, at the conclusion of a five-year term, both HCMG and Prime Partners continued their business relationship as it had previously existed under the 2004 PSA.  (FAC ¶ 45.)  In early 2011, Chaudhuri and Thomas[2] began to make reference to "the new ten-year group provider service agreement."  (FAC ¶ 46.)  Prime Partners maintained that it

---

[1] Independent practice associations typically are associations of independent physicians that provide services to managed care organizations at negotiated rates.

[2] Plaintiffs' FAC describes Foutz and Thomas as "an officer/accountant and attorney, respectively." (FAC ¶ 15.)  It is unclear to the Court, however, whether Foutz and Thomas held these positions with respect to HCMG or KM Management, or both.

never entered into a new PSA—much less one extending an additional 10 years—and consequently asked to see the document.  (*Id.*)  At a meeting in March 2011, members of Prime Partners were shown a new document bearing the same Group Provider Services Agreement name that appeared on the 2004 PSA and an effective date of December 17, 2009.  (*Id.*)  The end of the document contained three pages of executed signature blocks; Prime Partners insists, however, that nobody from Prime Partners ever signed the 2009 PSA.  (FAC ¶ 47.)  Instead, Prime Partners contends Defendants forged these signatures by cutting and pasting the signatures onto the document.  (*See id.*)

Based on these allegations and others not relevant here, Plaintiffs allege that Foutz and Thomas were actively engaged in a criminal enterprise with Chaudhuri, HCMG, and KM Management to systematically defraud medical groups in Southern California by creating false accounting records, forging documents, and engaging in a course of conduct designed to swindle medical groups of money owed to those groups.  Plaintiffs specifically contend that Chaudhuri and Foutz formed KM Management in early 2000 with the intent to use KM Management as an instrument for defrauding health plans, physicians, and patients.  (FAC ¶ 11.)  As relevant to the Court's analysis below, Plaintiffs allege that Defendants executed their fraud on Prime Partners and Meadowview through two criminal schemes.

The first scheme alleges, as described above, that Defendants forged several physicians' signatures on a 10-year Group Provider Services Agreement ("2009 PSA") purporting to obligate Prime Partners to HCMG's IPA services for an additional 10 years following the expiration of the previous five-year 2004 PSA. (FAC ¶ 105.)  When HCMG discovered that Prime Partners was seeking to discontinue its business relationship with HCMG and KM Management, Defendants allegedly instructed their attorneys to use the forged 2009 PSA as the basis of four cease-and-desist letters sent over a six-month period to prospective IPAs with which Prime Partners was negotiating.  (FAC ¶ 51.)  Specifically, in February 2011,

Defendants directed their attorneys to send a letter to PrimeCare, LLC instructing it to cease and desist negotiations with Prime Partners based on the forged 2009 PSA. (FAC ¶ 52.)  Plaintiffs contend PrimeCare discontinued all negotiations with Prime Partners as a result of this letter.  (FAC ¶ 53.)

On March 6, 2011, Defendants directed an identical cease-and-desist letter be sent to Epic Management, LP, another prospective IPA.  (FAC ¶ 54.)  On June 17, 2011, Defendants directed a follow-up letter to Epic insisting that Epic discontinue negotiations with Prime Partners.  (FAC ¶ 55.)  Plaintiffs allege that Epic discontinued all negations with Prime Partners as a result of the March and June 2011 letters, forcing Prime Partners again to continue its relationship with HCMG.  (FAC ¶ 56.)

Finally, on August 22, 2011, Defendants directed a fourth letter to Prospect Medical Group directing Prospect to cease negotiations with Prime Partners based on the forged 2009 PSA.  (FAC ¶ 57.)  Plaintiffs allege that while Prospect did not sever its negotiations with Prime Partners as a result of this letter, Prospect nevertheless imposed more onerous terms on Prime Partners as a result of the letter.  (FAC ¶ 58.)

Plaintiffs contend that none of the four letters were sent in anticipation of litigation contemplated in good faith and under serious consideration.  (FAC ¶¶ 52, 54, 55, 57.)  Rather, Plaintiffs maintain that the goal of the fraudulent letters was to prevent Prime Partners from contracting with another IPA on the basis of the forged 2009 PSA, which purports to engage HCMG as Prime Partners's IPA "for a period of ten (10) years from December 17, 2009 (or 2008)."  (FAC ¶ 108.)  Plaintiffs therefore surmise that "identical cease and desist letters will likely continue to be sent at the instruction of Defendants . . . through the U.S. Postal Service to every IPA that Prime Partners enters into negotiations with until at least 2019 (or 2018)."  (*Id.*)

The second alleged criminal scheme involves 6,600 forged letters purporting to be from Prime Partners and Meadowview physicians to elderly patients of the Secure Horizons health plan.  (FAC ¶¶ 68, 112.)  Plaintiffs allege these letters "falsely advised the elderly patients that unless they agreed to switch from the Secure[]

Horizons health plan to Citizen's Choice health plan, [those patients] would lose their primary care physician." (*Id.*)  Plaintiffs assert that the purpose of this second scheme was "to secure the continued income of the elderly patients by causing them to believe they would lose their doctor unless they changed their health plan to Citizen's Choice. This was not true, but by convincing these elderly patients to change to Citizen's Choice, HCMG and KM would receive revenue," although Plaintiffs fail to expand on how. (*Id.*)  Plaintiffs claim they were injured as a result of these letters "in that they have lost business associated with several elderly patients who have discontinued services with Plaintiffs as a result of the letters" and "have suffered damages from lost contractual relationships with physicians who were appalled by the conduct of the Defendants and thereafter discontinued or terminated their relationships with Plaintiffs." (FAC ¶¶ 71, 115, 117.)

As a result of these and various other contentions the Court does not address here, Plaintiffs filed a Complaint in California Superior Court for the County of Riverside on October 31, 2011.  The Complaint alleged 12 claims for: (1) fraud; (2) violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 ("RICO"); (3) breach of fiduciary duty; (4) breach of contract; (5) intentional interference with prospective economic advantage; (6) negligent interference with prospective economic advantage; (7) accounting; (8) unfair business practices; (9) conversion; (10) declaratory relief; (11) unjust enrichment; and (12) money had and received.  On November 22, 2011, Defendants removed the action to this Court on the basis that this Court had federal question jurisdiction over Plaintiff's RICO claim.  (ECF Nos. 1, 9, 22.)

On November 29, 2011, the Chaudhuri Defendants filed a motion to strike and a motion to dismiss Plaintiffs' fraud, RICO, and conversion claims.  (ECF Nos. 12, 15.)  In addition, on December 9, 2011, the Foutz Defendants filed a motion to dismiss and special motion to strike.  (ECF No. 25.)  On December 20, 2011, Plaintiffs filed their FAC, thereby rendering the then-pending motions moot.  (ECF

No. 28.)  The FAC contained the same 12 claims but added additional factual allegations.

On January 9, 2012, Defendants filed the Motions presently pending before the Court, which contain arguments essentially identical to those contained in the motions filed in late November and early December 2011 with respect to Plaintiff's original Complaint.  The Court turns now to Defendants' pending Motions.

### III.   LEGAL STANDARD

Dismissal under Rule 12(b)(6) can be based on "the lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  "To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint generally must satisfy only the minimal notice pleading requirements of Rule 8(a)(2)." *Porter v. Jones*, 319 F.3d 483, 494 (9th Cir. 2003).  Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  For a complaint to sufficiently state a claim, its "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  While specific facts are not necessary so long as the complaint gives the defendant fair notice of the claim and the grounds upon which the claim rests, *Erickson v. Pardus*, 551 U.S. 89, 93 (2007), a complaint must nevertheless "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

*Iqbal*'s "plausibility standard" is "not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement of relief."  *Id.* (internal citation and quotation marks omitted).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not

do.'" *Id.* (citing *Twombly*, 550 U.S. at 555).  The determination whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.

When considering a Rule 12(b)(6) motion, a court is generally limited to considering material within the pleadings and must construe "[a]ll factual allegations set forth in the complaint . . . as true and . . . in the light most favorable to [the plaintiff]."  *Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001) (citing *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996)).  A court is not, however, "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

As a general rule, leave to amend a complaint that has been dismissed should be freely granted.  Fed. R. Civ. P. 15(a).  However, leave to amend may be denied when "the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency."  *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir.1986); *see Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).

## IV.   DISCUSSION

Plaintiffs' FAC contains a single federal claim under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c)–(d), and several state-law claims.  Defendants collectively move to dismiss all of Plaintiffs' claims.  Because Plaintiffs fail to state a RICO claim, the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state-law claims and therefore does not address those claims.

### A.   Plaintiff's RICO Claim

RICO "makes it unlawful for any person employed by or associated with any enterprise . . . to conduct or participate . . . in the conduct of such enterprise's affairs through the commission of two or more statutorily defined crimes—which RICO calls

a pattern of racketeering activity." *Cedric Kushner Promotions, Ltd. v. King*, 553 U.S. 158, 160 (2001) (omissions in original); 18 U.S.C. § 1962(c). Plaintiffs bring their RICO claim under § 1962(c) and (d). To state a claim under § 1962(c),[3] Plaintiffs must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985) (footnote omitted). In addition, a plaintiff only has standing if the RICO predicate offenses were both the "but for" and proximate cause of an injury to plaintiff's business or property. *See* § 1964(c); *Sedima*, 473 U.S. at 496 ("[P]laintiff only has standing if . . . he has been injured in his business or property by the conduct constituting the violation."); *Hemi Group, LLC v. City of N.Y.*, 130 S. Ct. 983, 989 (2010) ("[T]o state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense 'not only was a "but for" cause of his injury, but was the proximate cause as well.'" (quoting *Holmes v. Sec.s Investor Protector Corp.*, 503 U.S. 258, 268 (1992))).

Plaintiffs contend that Defendants conducted or participated in the conduct of an enterprise's affairs through a pattern of racketeering activity composed of the two criminal schemes described above. (FAC ¶ 104.) The Foutz Defendants argue that the *Noerr-Pennington* doctrine bars Plaintiffs' RICO claim. (Foutz Mot. 24.) In addition, the Chaudhuri Defendants contend that Plaintiffs' RICO claim must be dismissed because "(1) Plaintiffs do not allege a pattern of racketeering activity; (2) Plaintiffs lack standing because the alleged patterns of racketeering activity did not proximately cause Plaintiffs any legally cognizable harm; (3) there are no facts that plausibly establish a RICO enterprise; (4) and Plaintiffs do not allege facts making it plausible that Defendants (a) conducted any enterprise (b) through a pattern of

---

[3] Section 1962(d) makes it "unlawful for any person to conspire to violate" § 1962(c). Because the Court finds that Plaintiffs fail to plead a viable claim under § 1962(c), the Court does not reach Plaintiffs' RICO claim as it pertains to § 1962(d).

racketeering activity." (Chaudhuri Mot. 2.)  The Court considers each argument in turn.

### 1.     *Noerr-Pennington* Immunity

The Court begins by considering the threshold issue whether Defendants are immunized from RICO liability with respect to the first alleged scheme by the *Noerr-Pennington* doctrine.  "Under the *Noerr-Pennington* doctrine, those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2003). While the *Noerr-Pennington* doctrine originally "arose in the antitrust context and initially reflected the Supreme Court's effort to reconcile the Sherman Act with the First Amendment Petition Clause," the Supreme Court has since applied *Noerr-Pennington* principles outside the antitrust field based on the constitutional foundation of the doctrine. *Id.* at 929–30; *see also id.* at 932–33 (applying *Noerr-Pennington* to RICO action premised on predicate acts of mail fraud related to pre-litigation demand letters and noting that a "successful RICO claim would quite plainly burden [defendant's] ability to settle legal claims short of filing a lawsuit").

Ninth Circuit precedent "establishes that communications between private parties are sufficiently within the protection of the Petition Clause to trigger the *Noerr-Pennington* doctrine, so long as they are sufficiently related to petitioning activity." *Id.* at 935.  Thus, the cease-and-desist letters Defendants sent to PrimeCare, Epic, and Prospect pursuant to the first scheme generally fall within the ambit of *Noerr-Pennington*'s immunity for petitioning conduct.  However, "[p]re-suit letters threatening legal action may nevertheless be restricted by law where they include representations so baseless that the threatened litigation would fall into the 'sham litigation' exception" to the *Noerr-Pennington* doctrine. *Theme Promotions, Inc. v. News Am. Marketing FSI*, 546 F.3d 991, 1007 (9th Cir. 2008).

To establish that Defendants' conduct was a "sham," Prime Partners must establish that (1) Defendants' cease-and-desist letters were objectively baseless in the

sense that Defendants could not reasonably have expected success on the merits *and*
(2) Defendants' subjective motivation was to interfere with Prime Partners's business
relationships. *See Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,
508 U.S. 49, 60–61 (1993). At the motion to dismiss stage, the Court need not
conclude whether Defendants' letters were a sham. *EcoDisc Tech. AG v. DVD
Format/Logo Licensing Corp.*, 711 F. Supp. 2d 1074, 1083 (C.D. Cal. 2010). Instead,
the Court "must decide only whether Plaintiff has properly pleaded that the conduct
was a sham, i.e., objectively unreasonable and subjectively motivated to interfere with
Plaintiff's business relationships." *Id.* Plaintiffs undoubtedly have done so here.

With respect to objective baselessness, Plaintiffs have pleaded that each of the
cease-and-desist letters was premised on a forgery and that none of the four letters
were sent in anticipation of litigation contemplated in good faith and under serious
consideration. (FAC ¶¶ 52, 54, 55, 57.) Taking Plaintiffs' allegations as true, the
Court finds that Defendants could not reasonably have expected success on the merits
because the pre-litigation letters were based on a patent misrepresentation. *Cf. Kottle
v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1060 (9th Cir. 1998) ("[I]n the context of a
judicial proceeding, if the alleged anticompetitive behavior consists of making
intentional misrepresentations to the court, litigation can be deemed a sham if a
party's knowing fraud upon, or its intentional misrepresentations to, the court deprive
the litigation of its legitimacy." (internal quotation marks omitted)).

As to Defendants' intention to interfere with Prime Partners's business
relationships, Plaintiffs have unambiguously pleaded that "the intent of the letters was
to prevent Prime Partners from entering into any agreement with a new IPA, other
than HCMG, thereby ensuring that [Defendants] could continue to defraud Prime
Partners and siphon off revenue due and owing to Prime Partners." (FAC ¶ 51.)
While Plaintiffs frame Defendants' scheme as one intended to inflict harm on Prime
Partners, Defendants nevertheless carried out the scheme by interfering with Prime
Partners's potential business relationships. At the motion to dismiss stage, the Court

deems these allegations sufficient to satisfy the second prong of the sham litigation exception and thereby preclude *Noerr-Pennington* immunity.  Accordingly, the Court proceeds to address the adequacy of Plaintiffs' FAC with respect to the substantive elements of the alleged RICO violation.

      2.    *Pattern of Racketeering Activity*

As explained above, to state a claim under § 1962(c), Plaintiffs must allege that each Defendant employed a pattern of racketeering activity to participate in the operation or management of an enterprise, which proximately resulted in harm to Plaintiffs.  *Sedima*, 473 U.S. at 496; *Hemi Group*, 130 S. Ct. at 989.

The Chaudhuri Defendants argue first that Plaintiffs have failed to allege a pattern of racketeering activity.  A pattern of racketeering activity consists of at least two predicate acts of racketeering committed within a 10-year period.  18 U.S.C. § 1961(5).  Predicate acts are acts indictable under a specified list of criminal laws, § 1961(1)(B), including mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343.  The Supreme Court has explained that to establish the existence of a "pattern," a plaintiff must show both (1) relatedness of the predicate acts; and (2) that those predicate acts "amount to or pose a threat of continued criminal activity."  *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989).

      **a.  Relatedness**

Predicate acts are related if they have "the same or similar purposes, results, participants, victims or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."  *Id.* at 240 (quoting 18 U.S.C. § 3575(e)).  Plaintiff's FAC appears to proceed on the theory that the two criminal schemes are sufficiently related for purposes of establishing a RICO pattern.  While Defendants' Motions do not address relatedness and Plaintiffs consequently do not defend relatedness, the Court notes sua sponte that the two schemes Plaintiffs allege are not sufficiently related to constitute a single pattern.

According to Plaintiffs, "the purpose of the [first scheme] was to prevent Prime Partners from engaging in business with an IPA other than HCMG" (FAC ¶ 106), while the purpose of the second scheme was "to secure the continued income of the elderly patients" (FAC ¶ 112).  As a result of the first scheme, various IPAs either ceased negotiations or imposed more onerous terms on Prime Partners (FAC ¶¶ 53, 56, 58); as a result of the second scheme, "Plaintiffs have lost the business of several elderly patients and the doctors where were appalled by" Defendants' conduct (FAC ¶ 115).  Prime Partners and the IPAs with which Prime Partners was negotiating were the victims of the first scheme, while the elderly patients were the direct victims of the second scheme.  While each scheme was accomplished by use of forged documents, the Court's consideration of the purposes, results, and victims of the two schemes convince the Court that the schemes were isolated criminal acts insufficient to satisfy the relatedness requirement.  *See Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 366 (9th Cir. 1992) ("An allegation of two isolated criminal acts is insufficient to satisfy the relatedness requirement . . . .").  Indeed, Plaintiff's isolated treatment of the two schemes in the FAC underscores this conclusion.  Accordingly, the Court must proceed to address Plaintiffs' two alleged schemes individually to determine whether either individual scheme was sufficiently continuous to constitute a pattern under RICO.

### b.  Continuity

Because "Congress was concerned in RICO with long-term criminal conduct," continuity must be established by proving either "a series of related predicates extending over a substantial period of time" (closed-ended continuity) or "past conduct that by its nature projects into the future with a threat of repetition" (open-ended continuity).  *Id.* at 241–42.  Plaintiffs do not contend that either of the two alleged criminal enterprises had closed-ended continuity, and neither did as a matter of law because neither scheme, as alleged, lasted longer than six months.  *E.g.*, *H.J., Inc.*, 492 U.S. at 242 ("A party alleging a RICO violation may demonstrate continuity

over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement . . . ."); *Religious Tech. Ctr.*, 971 F.2d at 366–67 (9th Cir. 1992) ("We have found no case in which a court has held the [continuity] requirement to be satisfied by a pattern of activity lasting less than a year.  A pattern of activity lasting only a few months does not reflect the 'long term criminal conduct' to which RICO was intended to apply.")[4] That Plaintiffs allege at least 6,000 individual acts of fraudulent misrepresentation making up the second criminal scheme does not alter this conclusion.  *E.g.*, *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1025 (7th Cir. 1992) ("[T]he sizable number of mailings does not show that defendants operated a long-term criminal operation."). The Court is therefore left to consider only whether either of Plaintiffs' alleged criminal schemes satisfies open-ended continuity.

To allege open-ended continuity, "a RICO plaintiff must charge a form of predicate misconduct that by its nature projects into the future with a threat of repetition."  *Turner v. Cook*, 362 F.3d 1219, 1229 (9th Cir. 2004) (internal quotation marks omitted).  Thus, "[a] plaintiff cannot demonstrate open-ended continuity if the

---

[4] To the extent Plaintiffs' allegation that Defendants' "acts of mail fraud are consistent with the criminal enterprise initiated by Chaudhuri in 1999 and conforms to the manner in which Defendants . . . conduct their business so as to destroy medical practices and physicians for personal gain" (FAC ¶ 120) is meant to implicitly establish closed-ended continuity, it fails to do so.  Because predicate acts must occur within 10 years of each other to constitute a pattern, *see* 18 U.S.C. § 1961(5), Defendants' conduct prior to February 2001 (10 years prior to the February 2011 letter Defendants sent to PrimeCare comprising part of Plaintiffs' first alleged criminal scheme, which is the earliest date Plaintiffs explicitly allege in association with either scheme) would fail RICO's pattern requirement when viewed in conjunction with the two criminal schemes forming the crux of Plaintiffs' RICO claim.  Further, Plaintiffs fail to allege how any of Defendants' actions in April 2001 (*see* FAC ¶¶ 22, 27 ("Within the first 18 months of Chaudhuri acquiring the clinics and medical practice from MedPartners [in September 1999] . . . ."), 2002 (FAC ¶ 30), 2004 (FAC ¶ 35), or early 2011 (FAC ¶ 37) constituted a predicate act enumerated in § 1961(1)(B).  Finally, neither of the criminal schemes Plaintiffs allege lasted more than a year, and even if the alleged schemes were sufficiently related to constitute a single pattern, Plaintiffs have failed to allege when the second scheme took place; thus, the Court has no basis for determining the length of any purported aggregate pattern.

racketeering activity has a built-in ending point." *US Airline Pilots Ass'n v. Awappa, LLC*, 615 F.3d 312, 319 (4th Cir. 2010) (internal quotation marks omitted) (collecting cases); *see also Turner*, 362 F.3d at 1230 (RICO defendants "failed to satisfy *H.J. Inc.*'s open-ended continuity requirements since the alleged actions were finite in nature in that the mailings, faxes and telephone calls would cease once [the RICO defendants] collected the outstanding tort judgment against" plaintiff). This is so "even if the purported scheme takes several years to unfold, involves a variety of criminal acts, and targets more than one victim." *Gamboa v. Velez*, 457 F.3d 703, 709 (7th Cir. 2006) (collecting cases).

Plaintiffs' first scheme alleges that Defendants utilized "the forged 2009 PSA to prevent Prime Partners from contracting with another IPA" (FAC ¶ 49) and will continue to send the forged PSA "to every potential IPA that Prime Partners enters into negotiations with until at least 2019 (or 2018)." (FAC ¶ 108.) These allegations unambiguously identify a built-in end point to the first criminal scheme—the termination of the allegedly forged 2009 PSA by its terms. This definitively defeats the possibility of open-ended continuity for the first scheme, notwithstanding that several years remain until the termination of the 2009 PSA. And in light of evidence in the record that Prime Partners has terminated "all written and oral contracts [with] HCMG . . . effective December 1, 2011," the Court is convinced that Plaintiff could not plausibly allege in good faith open-ended continuity with respect to this scheme in any amended version of this claim. ECF No. 17-17, Foutz Decl. Ex. 15.

Plaintiffs' second scheme alleges that Defendants' mailing of 6,000 forged letters to elderly Secure Horizons health plan participants on an unstated date over an undisclosed period of time creates a threat of future criminal conduct because Defendants "are in possession of blank sheet of paper that have been executed by physicians," which Defendants "are capable of manipulating . . . at any time to achieve their own financial desires." (FAC ¶ 118.) This factually unsupported recitation of RICO's continuity requirement fails to establish a plausible theory of

continuity.  *See Iqbal*, 556 U.S. at 678; *see also Jackson v. BellSouth Telecomm.*, 372 F.2d 1250, 1268–69 ("[P]laintiffs' bald suggestion that the defendants might have continued their fraud in the future had they not been uncovered . . . is not sufficient to allege open-ended continuity.").  Plaintiff's allegations of continuity with respect to the second scheme are also contrary to the facts alleged to support the second scheme, which suggest a single—if widespread—act of fraudulent misrepresentation isolated to a unique set of non-recurring facts and a discrete purpose.  The Court therefore finds that the second criminal scheme similarly fails to establish open-ended continuity.

Because Plaintiffs have failed to plead with sufficient factual specificity that the two alleged criminal schemes were related or that either scheme individually amounted to or posed a threat of continued criminal activity, Plaintiffs have failed to allege a RICO pattern.  Accordingly, Plaintiffs have failed to allege a facially plausible RICO claim.  The Court proceeds, however, to consider the extent to which Plaintiff's RICO claim suffers from additional, and possibly irreparable, pleading deficiencies.

   3.   *Proximate Causation*

The Chaudhuri Defendants contend next that Plaintiffs have failed to establish that Defendants' allegedly fraudulent acts proximately caused Plaintiffs' injuries.  "Proximate cause for RICO purposes . . . requires some direct relation between the injury asserted and the injurious conduct alleged.  A link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient."  *Hemi Group*, 130 S. Ct. at 989 (alteration in original) (internal quotation marks omitted).

The Supreme Court in *Holmes v. Securities Investor Protection Corp.* articulated three motivating principles for RICO's stringent proximate causation requirement: "First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors."  503 U.S. 258, 269 (1992).  Second, undesirably

complex rules may be necessary to apportion damages associated with remote injuries. *Id.* Third, "the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely." *Id.* at 269–70.

With respect to the first scheme, Plaintiffs aver that Defendants' letters to PrimeCare and Epic insisting they cease negotiations with Prime Partners on the basis of the allegedly forged 2009 PSA caused these entities to "discontinue all negotiations with Prime Partners," thereby forcing Prime Partners "to continue its relationship with HCMG." (FAC ¶¶ 53, 56.) In addition, Prime Partners alleges that an identical letter to Prospect caused Prospect to impose "more onerous terms on Prime Care." (FAC ¶ 58.) These allegations suffer several shortcomings that preclude a plausible showing of proximate causation. For example, Prime Partners does not plead that any contracts with PrimeCare, Epic, or Prospect were imminent, or even reasonably certain to be entered. Nor does Prime Partners allege any *facts* plausibly identifying Defendants' communications as the direct cause of the failed or frustrated negotiations. These facts are necessary to vindicate the first concern articulated in *Holmes*, to wit, the difficulty in ascertaining "the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors." *Holmes*, 503 U.S. at 269. Without these additional facts, Plaintiff has done little more than pay lip service to RICO's proximate cause element.

Regarding Defendants' second scheme, Plaintiffs maintain that they "have suffered damages in that they have lost the business associated with several elderly patients who have discontinued services with Plaintiffs as a result of the letters" that "falsely advised the elderly patients that unless they agreed to switch from Secure[] Horizons' health plan to Citizen's Choice health plan, they would lose their primary care physician." (FAC ¶¶ 68, 71.) These allegations are confusing at best. First,

Plaintiffs do not provide any detail regarding the Secure Horizons and Citizen's Choice health plans. Based on Plaintiffs' statement that the representations in the letters were "not true, but by convincing these elderly patients to change to Citizen's Choice, HCMG and KM would receive revenue," the Court can only surmise that Secure Horizons was a health plan associated with Prime Partners or Meadowview, or both, and that Secured Citizen's Choice was associated with Defendants.

Second, Plaintiffs' allegations are similarly unclear regarding the types of services these elderly patients discontinued, and thus what type of business Plaintiffs contend they lost in conjunction with these patients. This confusion is compounded by Plaintiffs' allegation that the 2004 PSA "required HCMG to act as the 'IPA' for Prime Partners and to pay Prime Partners 100% of all revenue received by HCMG from its contracted health maintenance organizations ('HMOs') for patients assigned to, or enrolled with, Prime Partners physicians." (FAC ¶ 41.) It would seem from this allegation that HCMG would be required to pay at least Prime Partners any revenue it gained as a result of the patients' switch to Citizen's Choice, thereby canceling out any damage. In short, absent additional critical facts, Plaintiffs' allegations of loss proximately caused by Defendants' second scheme are virtually unintelligible.

Also with respect to the second scheme, Plaintiffs contend they "have suffered damages from lost contractual relationships with physicians who were appalled by the conduct of the Defendants and thereafter discontinued or terminated their relationships with Plaintiffs." (FAC ¶ 71.) This harm is too attenuated to Defendants' alleged misconduct to satisfy proximate cause under RICO. "As the Court reiterated in *Holmes*, '[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step,' and that 'general tendency' applies with full force to proximate cause inquiries under RICO." *Hemi Group*, 130 S. Ct. at 985 (quoting *Holmes*, 503 U.S. at 271–72). Taking Plaintiffs' allegations as true, the chain of causation runs as follows: Defendants send forged letters to 6,000 elderly patients; several unnamed physicians somehow learn of the letters, recognize Defendants'

17

1   purported fraud, and become appalled; and those physicians make the independent

2   decision to terminate their relationships with Plaintiffs.  Arriving at the loss of

3   physicians from Defendants' letters directed at elderly patients therefore requires this

4   Court to move beyond the first step in the chain of causation, which defeats proximate

5   causation under RICO.

6        In sum, Plaintiffs have failed to allege sufficient facts to plausibly establish

7   proximate causation under RICO under either criminal scheme.  Plaintiffs' RICO

8   claim is therefore independently dismissible for lack of a plausible theory of

9   proximate causation.

10       *4.    RICO Enterprise*

11       The Chaudhuri Defendants further argue that Plaintiffs' allegation that

12  "Defendants Chaudhuri, Foutz, Thomas, HCMG and KM are an enterprise engaged in

13  or affecting interstate or foreign commerce" (FAC ¶ 102) fails to plead the existence

14  of an enterprise with sufficient specificity to withstand *Twombly* and *Iqbal*.  The Court

15  disagrees.

16       RICO defines an "enterprise" as including "any individual, partnership,

17  corporation, association, or other legal entity, and any union or group of individuals

18  associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  "The enterprise'

19  is not the 'pattern of racketeering activity'; it is an entity separate and apart from the

20  pattern or activity in which it engages."  *United States v. Turkette*, 452 U.S. 576, 583

21  (1981).

22       Plaintiffs' FAC, while not a model of clarity, suggests that Plaintiffs intend to

23  allege an association-in-fact enterprise, which the Supreme Court has defined as a

24  "group of persons associated together for a common purpose of engaging in a course

25  of conduct."  *Id.*  In *Boyle v. United States*, the Supreme Court explained that "an

26  association-in-fact enterprise must have at least three structural features: a purpose,

27  relationships among those associated with the enterprise, and longevity sufficient to

28  permit these associates to pursue the enterprise's purpose."  556 U.S. 938, 946 (2009).

"[I]t is clear after *Twombly* that a RICO claim must plead facts plausibly implying the existence of an enterprise with the structural attributes identified in *Boyle*."  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 369–70 (3d Cir. 2010) (citing *Rao v. BP Prods. N. Am., Inc.*, 589 F.3d 389, 400 (7th Cir. 2009); *Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 307 (S.D.N.Y. 2010); *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008)).

Were Plaintiffs' statement that "Defendants Chaudhuri, Foutz, Thomas, HCMG and KM are an enterprise" the sum of Plaintiffs' enterprise allegations, the Court would agree that Plaintiffs had failed to allege the existence of an enterprise.  But it appears Defendants overlooked the immediately preceding paragraph in Plaintiffs' FAC, which states, "Since at least 1999, Defendants . . . have been engaged in a criminal enterprise within the meaning of 18 U.S.C. § 1961(f).  Defendants['] . . . criminal enterprise uses a pattern of mail fraud and forgery to further the financial interests of Defendants . . . at the expense of the general public and HCMG's IPA providers.  Plaintiffs are informed and believe and thereon allege that Defendants HCMG and KM are corporate entities which have been used by Defendants Chaudhuri, Foutz and Thomas, as well as Mary Demsey and Karen Sember to carry out the illegal and fraudulent activities set forth herein."  (FAC ¶ 101.)  From this, the Court can glean that Defendants' purpose was to use a pattern of mail fraud and forgery to further their financial interests; that Chaudhuri, Foutz, and Thomas associated with two corporate entities to form a relationship to carry out its purpose; and that the enterprise has been in existence since 1999 and continues today.  Further, Plaintiffs' FAC contains sufficient factual matter to support these allegations.  While these may be the bare minimum allegations Plaintiffs could have asserted to establish the existence of an association-in-fact enterprise, the Court finds that they are nevertheless sufficient for purposes of *Iqbal*.

5.      *Conduct of an Enterprise Through a Pattern of Racketeering Activity*

"Mere association with an enterprise does not violate § 1962(c)."  *In re Insurance Brokerage Antitrust Litig.*, 618 F.3d at 370.  Rather, § 1962(c) makes it unlawful for a person associated with a RICO enterprise "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs."  As the Supreme Court has explained, this simply means that to be liable under RICO, "one must participate in the operation or management of the enterprise itself" through the alleged pattern of racketeering activity.  *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993).  Accordingly, "[t]he requirements of § 1962(c) must be established as to each individual defendant."  *Craig Outdoor Advertising, Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1027 (8th Cir. 2008) (citing *Sedima*, 473 U.S. at 500).

Defendants contend that "Plaintiffs have not alleged any facts describing how each individual Defendant directed the purported enterprise—i.e. the unified whole of all defendants taken together—either generally or through a pattern of racketeering activity."  (Chaudhuri Mot. 18.)  Defendants are correct.  Plaintiffs  rarely distinguish in their FAC between individual defendants, opting instead to indiscriminately lump all Defendants together as "Defendants Chaudhuri, Foutz, Thomas, HCMG and KM."  By pleading in this fashion, Plaintiffs fail to delineate how any of these individual defendants independently participated in the operation or management of the enterprise, much less how they did so through the alleged pattern or patterns of racketeering activity.  Indeed, as discussed above, Plaintiffs have barely pleaded the existence of an enterprise and have failed to plausibly allege a RICO pattern.

Plaintiffs argue in opposition that they "have pled not only that each defendant was a member of the criminal enterprise, but also that each defendant was an active participant in the criminal activity that took place."  (Opp'n 12.)  This argument overlooks the very essence of § 1962(c)'s "conduct or participate, directly or indirectly, in the conduct of [the] enterprise's affairs" requirement, which is that the two elements Plaintiffs allege they have pleaded actually combine for a specific

purpose.  What Plaintiffs' FAC lacks is the requisite *connection* between Defendants'

association with the enterprise and Defendants' participation in the alleged criminal

activity.  That missing connection is how each individual Defendant exploited his or

its participation in the criminal activity as a means *to participate in the operation or*

*management* of the enterprise with which each Defendant was associated.  Plaintiffs

make no attempt to establish this connection and thus fail to allege how any

Defendant participated in the operation or management of the alleged enterprise

through the alleged pattern of criminal activity.

      6.   *Conclusion*

      To plead a RICO claim sufficient to withstand a motion to dismiss, Plaintiffs

were required to allege that each Defendant employed a pattern of racketeering

activity to participate in the operation or management of an enterprise, which

proximately resulted in harm to Plaintiffs.  While Plaintiffs have tenuously established

the existence of a RICO enterprise, Plaintiffs have failed to establish any of the

remaining elements sufficient to establish a facially plausible RICO claim.

Defendants' Motions are therefore **GRANTED** with respect to Plaintiffs' second

claim for violation of RICO.

      In addition, the Court finds it significant that the Chaudhuri Defendants' present

Motion to Dismiss going to the merits of Plaintiffs' RICO claim is nearly identical to

the motion to dismiss these parties filed several weeks before Plaintiffs filed their

FAC.  (*See* ECF Nos. 15, 16.)  This reflects that at the time Plaintiffs filed their FAC,

Plaintiffs had been made aware of the significant pleading deficiencies addressed

above; nevertheless, Plaintiffs made only meager factual amendments to their RICO

claim that largely failed to address the more basic pleading failures.  This fact,

combined with the very serious problems plaguing nearly every element of Plaintiffs'

RICO claim, convinces the Court that any attempt to amend this claim would be

futile.  Accordingly, Plaintiffs' second—and sole federal—claim is hereby

**DISMISSED WITH PREJUDICE**.  *See AE ex rel. Hernandez v. County of Tulare*,

1   666 F.3d 631, 636 (9th Cir. 2012) ("A district court abuses its discretion by denying

2   leave to amend unless amendment would be futile . . . .")

3   **B.      Plaintiff's Remaining State-Law Claims**

4          In addition to their federal RICO claim, Plaintiffs have alleged various state-law

5   claims.  Defendants removed this action to federal court on the basis that this Court

6   has federal jurisdiction over Plaintiff's RICO claim and supplemental jurisdiction over

7   the state-law claims because the state-law claims "arise out of the same set of facts as

8   the RICO claim so as to form part of the same case or controversy."  (Dkt. No. 1, at 2

9   (citing 28 U.S.C. § 1367).)  Because the Court dismisses Plaintiffs' sole federal claim

10  under RICO, however, the Court currently lacks federal question jurisdiction.  The

11  Court therefore declines to exercise supplemental jurisdiction over the remaining state

12  law-claims pursuant to 28 U.S.C. § 1367(c)(3).  *Ove v. Gwinn*, 264 F.3d 817, 826 (9th

13  Cir. 2001) ("A court may decline to exercise supplemental jurisdiction over state-law

14  claims once it has dismissed all claims over which it has original jurisdiction."); *see*

15  *also San Pedro Hotel Co. v. City of L.A.*, 159 F.3d 470, 478 (9th Cir. 1998) (district

16  courts not required to provide explanation when declining jurisdiction under 28

17  U.S.C. § 1367(c)(3)).

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

1   ///

2   ///

3                           **V.    CONCLUSION**

4          For the reasons discussed above, Defendants' Motions (ECF Nos. 38, 43[5]) are

5   **GRANTED** with respect to Plaintiffs' second claim for violation of RICO, which is

6   **DISMISSED WITH PREJUDICE**.  The Chaudhuri Defendants' Motion to Strike

7   (ECF No. 40) is **DENIED AS MOOT**.  Having dismissed Plaintiffs' sole federal

8   claim under RICO, the Court declines to exercise supplemental jurisdiction over the

9   remaining state-law claims.  This case is therefore **REMANDED** to the California

10  Superior Court for the County of Riverside.

11

12         **IT IS SO ORDERED.**

13

14         May 14, 2012

15

16  _____

17                    **HON. OTIS D. WRIGHT, II**
                **UNITED STATES DISTRICT JUDGE**

18

19

20

21

22

23

24

25

26

27  _____

    [5] The Foutz Motion is **DENIED** insofar as it argues Plaintiffs' RICO claim is barred by the *Noerr-*
28  *Pennington* doctrine but **GRANTED** to the extent that it joins in the arguments raised in the
    Chaudhuri Motion.  (Foutz Mot. 25 (joining in the Chaudhuri Defendants' Motion).)